**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**December 12, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

VICTOR MANUEL TORRES-
CASTRO,

Defendant - Appellant.

No. 05-2357

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-04-2537)**

---

Sasha Siemel, (Laura Fashing, Assistant United States Attorney and David C. Iglesias, United States Attorney, on the brief), Albuquerque, New Mexico, for Plaintiff - Appellee.

Phillip P. Medrano, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant - Appellant.

---

Before **TACHA**, Chief Judge, **KELLY**, and **MURPHY**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Defendant-Appellant Victor Manuel Torres-Castro appeals from his

convictions for possession of an unregistered firearm (sawed-off shotgun) (count

1), 26 U.S.C. §§ 5481, 5681(d) & 5871, and possession of a firearm by an illegal alien (count 2), 18 U.S.C. §§ 922(g)(5) & 924(a)(2). He was tried before a jury, found guilty, and sentenced to concurrent 46 month terms of imprisonment and concurrent two-year terms of unsupervised release. On appeal, Mr. Torres-Castro contests the district court's denial of his motion to suppress certain evidence and statements obtained by Albuquerque police officers at his home on December 4, 2004. See United States v. Torres-Castro, 374 F. Supp. 2d 994 (D.N.M. 2005). He agrees with the district court's holding that the police conducted an unlawful protective sweep of his home, but he argues that the sweep and the shotgun shells observed during the sweep tainted his consent to search for a shotgun, discovery of the shotgun, and his later post-arrest statements to police. Accordingly, he argues that the district court erred in refusing to suppress the shotgun shells, the shotgun, and the statements made by him as fruit of the poisonous tree. Our jurisdiction arises under 28 U.S.C. § 1291 and we affirm.

Background[1]

---

[1] Some facts were controverted and dependent on the district court's credibility determinations. When reviewing the denial of a motion to suppress, we view the facts in the light most favorable to the government and for clear error. United States v. Guerrero-Espinoza, 462 F.3d 1302, 1305 (10th Cir. 2006). Fourth Amendment reasonableness is reviewed de novo. Id. Mr. Torres-Castro takes issue with several findings of fact by the district court. Aplt. Br. 13-14. We have reviewed the record and find the district court's factual findings are

(continued...)

2

On December 2, 2005, Albuquerque police encountered a fourteen-year-old girl running down Central Avenue in Albuquerque, New Mexico. The girl told police that her boyfriend was twenty years old, that he had been chasing her, and that he had threatened to beat her. The police transported the girl to a police substation where she identified her boyfriend as Mr. Torres-Castro. She informed the police that Mr. Torres-Castro was an illegal alien who had been once deported, that she and Mr. Torres-Castro had engaged in sex, that he possessed a gun, that he had beaten her in the past and restrained her from leaving, and that he had threatened to shoot anyone who tried to take her away. While at the station, the girl identified a photograph of Mr. Torres-Castro, which allowed police to verify his age and familiarize themselves with his appearance. Later that night, the girl's mother informed police that she was in the process of obtaining a restraining order against Mr. Torres-Castro.

Based on this information, police officers Dan Phel, Elder Guevara, and Mark Elrick decided to visit Mr. Torres-Castro's home. They arrived at around 7:00 p.m. on December 4, 2004, intending to question him but not to arrest him. The officers had neither an arrest warrant nor a search warrant. Before arriving at the home, Officer Phel told Officers Guevara and Elrick that Mr. Torres-Castro had a gun and had engaged in domestic violence. As the officers approached the

[1](...continued)
adequately supported by the record and its reasonable inferences.

3

house, they identified Mr. Torres-Castro through a front window and noticed that several other individuals were seated in the front room. While the officers were looking through the window, one of the individuals in the home saw the officers and said something to the other individuals, whereupon some left the front room and moved elsewhere in the house.

Officer Phel then knocked on the front door, which Mr. Torres-Castro opened. The officers were uniformed but did not draw their weapons. Officer Phel asked permission for all officers to enter and talk to Mr. Torres-Castro. Mr. Torres-Castro agreed, and all three officers entered the house. Officer Phel began to question Mr. Torres-Castro about his relationship with his juvenile girlfriend. During this time, Officers Elrick and Guevara noticed that several individuals were in plain view in one or more back rooms. Officers Elrick and Guevara then conducted a brief protective sweep of the other rooms in the house and directed all individuals in the other rooms to return to the front room and be seated. None of the individuals or Mr. Torres-Castro objected and all individuals located in the home were assembled in the front room.

While conducting the protective sweep, Officer Elrick saw a box of shotgun shells in a clear plastic bag on a shelf in an open closet in a bedroom. Officer Elrick told the other officers about the shells but did not remove them. Officer Elrick remained near the bedroom door while the other officers spoke with the individuals in the front room.

4

Officer Guevara then asked each of the individuals if they had any weapons and if they would consent to a search of the residence. During this questioning, Officer Guevara specifically advised Mr. Torres-Castro in Spanish that he did not have to answer. Officer Guevara testified that officer safety issues prompted his questioning and that such safety issues arose after discovery of the shells and with the officers' prior knowledge that Mr. Torres-Castro had a gun. R. Vol. III, at 44-45 (Tr. Feb. 5, 2005). Officer Phel testified that he did not intend to arrest Mr. Torres-Castro based on the discovery of the shells because he did not know it was illegal for him to possess them.

Officer Guevara eventually asked Mr. Torres-Castro, "Is there a shotgun in the house? Where is the shotgun at?" Mr. Torres-Castro responded in Spanish that there was a shotgun located under a mattress in the bedroom where the shells were located, and he gave consent for the officers to search the house for weapons. The district court determined that such consent was voluntary under the totality of the circumstances. At some point, while the individuals were assembled in the front room, the officers conducted a pat-down search of each male for weapons.

Officer Guevara located the shotgun in the bedroom and noticed that it appeared to be an illegal sawed-off shotgun. About five minutes elapsed from the officers' entry into the home until their discovery of the shotgun. Because the officers knew it was illegal for Mr. Torres-Castro to possess a sawed-off shotgun,

5

they notified Agent Francisco Ortega of the Bureau of Alcohol, Tobacco, and Firearms (ATF), who arrived at the house shortly thereafter. Before Agent Ortega arrived, Officer Phel moved Mr. Torres-Castro to the bedroom where the gun was located and attempted to question him. Mr. Torres-Castro was uncooperative and Officer Phel handcuffed him. At that time, Officer Phel arrested Mr. Torres-Castro for possessing an illegal weapon and for charges relating to the mistreatment of his girlfriend. When Agent Ortega arrived at the house, he gave Mr. Torres-Castro <u>Miranda</u> warnings. Thereafter, Mr. Torres-Castro made incriminating statements.

Mr. Torres-Castro moved to suppress the evidence found in his house and any statements he made to the officers. The district court denied the motion after an evidentiary hearing. It first held that the protective sweep performed by the officers violated the Fourth Amendment because the sweep was not performed incident to an arrest. Notwithstanding, it found that the protective sweep did not taint any subsequently obtained evidence or statements. The district court reasoned that the officers had probable cause to arrest Mr. Torres-Castro and question him about weapons based upon independent sources prior to the protective sweep. It further held that Mr. Torres-Castro voluntarily admitted the officers to his home, consented to a search of the residence, and voluntarily made incriminating statements.

## Discussion

### A. Protective Sweep

In <u>Maryland v. Buie</u>, 494 U.S. 325, 327 (1990), the Supreme Court stated that "a protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." The Court held that such protective sweeps are permitted when officers "possess[] a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[] the officer in believing that the area swept harbor[s] an individual posing a danger to the officer or others." <u>Id.</u> (internal citations and quotation omitted). A sweep must last no longer than necessary to dispel the "reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." <u>Id.</u> at 335-36.

Following <u>Buie</u>, we held that such "protective sweeps" are only permitted incident to an arrest. <u>See</u> <u>United States v. Davis</u>, 290 F.3d 1239, 1242 n.4 (10th Cir. 2002) (rejecting an argument that protective sweeps should sometimes be permitted absent an arrest); <u>United States v. Smith</u>, 131 F.3d 1392, 1396 (10th Cir. 1997) (noting that a protective sweep "is a brief search of premises during an arrest to ensure the safety of those on the scene"). In <u>United States v. Garza</u>, an unpublished disposition, we declined to extend the protective sweep doctrine to cases where there is no arrest. <u>See</u> 125 Fed. App'x. 927, 931 (10th Cir. 2005)

7

("We have twice found that a protective sweep may only be performed incident to an arrest."). Garza made clear that based on this court's prior published cases of Davis and Smith, protective sweeps must be performed incident to an arrest. Id.

Mr. Torres-Castro argues that any expansion of the protective sweep doctrine is unjustified because the doctrine is premised on the assumption that an arrest is confrontational by its very nature. Mr. Torres-Castro argues that expanding the doctrine will encourage law enforcement to gain legal entry through "knock and talk" requests and then gather evidence without any requirement of suspicion or compliance with the Fourth Amendment. We recognize that a majority of circuits have extended the protective sweep doctrine to cases where officers possess a reasonable suspicion that their safety is at risk, even in the absence of an arrest. See, e.g., United States v. Martins, 413 F.3d 139, 150 (1st Cir. 2005) ("[T]he key is the reasonableness of the belief that the officers' safety or the safety of others may be at risk."), cert denied 126 S. Ct. 644 (2005); United States v. Miller, 430 F.3d 93, 100 (2d Cir. 2005) ("The restriction of the protective sweep doctrine only to circumstances involving arrests would jeopardize the safety of officers in contravention of the pragmatic concept of reasonableness embodied in the Fourth Amendment."); United States v. Gould, 364 F.3d 578, 584 (5th Cir. 2004) (en banc) ("[W]e hold that arrest is not always, or per se, an indispensable element of an in-home protective sweep . . . ."), cert denied, 543 U.S. 955 (2004).

8

We appear to be joined by only the Eighth Circuit and perhaps one panel of the Ninth Circuit, although there also appears to be an intra-circuit conflict, in our belief that a protective sweep must be performed incident to an arrest. See United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005) (declining the invitation to "extend Buie further"); United States v. Reid, 226 F.3d 1020, 1027 (9th Cir. 2000) (refusing to permit a protective sweep where the defendant was not under arrest); contra United States v. Garcia, 997 F.2d 1273, 1282 (9th Cir. 1993) (permitting a protective sweep after a consented entry). Whatever our view of the holdings in Davis and Smith, we are not free to overrule those decisions and adopt the majority view allowing protective sweeps based on reasonable suspicion alone. See Dubuc v. Johnson, 314 F.3d 1205, 1209 (10th Cir. 2003) (noting that a panel of this court may not overrule another panel). Instead, we must conclude that a protective sweep is only valid when performed incident to an arrest–at least until an en banc panel of this court determines otherwise.

Even under our precedent, however, a search may precede an arrest and still be incident to that arrest. See Rawlings v. Kentucky, 448 U.S. 98, 111 (1980) ("Where the formal arrest followed quickly on the heels of the challenged search [it is not] particularly important that the search preceded the arrest rather than vice versa."). We have followed Rawlings to allow searches of vehicles and persons prior to an arrest. See United States v. Lugo, 170 F.3d 996, 1003 (10th Cir. 1999) (search of a vehicle preceding arrest); United States v. Anchondo, 156

9

F.3d 1043, 1045 (10th Cir. 1998) (search of a person preceding arrest).  In such cases, there must be a legitimate basis for the arrest prior to the search, and the arrest must follow quickly thereafter.  Anchondo, 156 F.3d at 1045.  There is no reason why the same rule should not apply to protective sweeps of a residence. Protective sweeps, wherever they occur, may precede an arrest, and still be incident to that arrest, so long as the arrest follows quickly thereafter.  See United States v. Donaldson, 793 F.2d 498, 503 (2d Cir. 1986) (holding that a search of an apartment to secure an individual immediately prior to an arrest was incident to an arrest).

The time at which an officer forms the intent to arrest is not determinative. Anchondo, 156 F.3d at 1045.  Instead, to determine whether a search is incident to an arrest, we ask only (1) whether "a legitimate basis for the arrest existed before the search," and (2) whether "the arrest followed shortly after the search." Id.  Of course, the legitimate basis for an arrest is purely an objective standard and can be for any crime, not merely that for which the defendant is ultimately charged after the protective sweep.  See Lugo, 170 F.3d at 1003 (traffic violations were a legitimate basis for a search, even though defendant was ultimately arrested for possession of drugs); see also Brigham City v. Stuart, 126 S. Ct. 1943, 1948 (2006) (action is reasonable under the Fourth Amendment as long as the objective circumstances justify the action); Whren v. United States, 517 U.S. 806, 813 (1996) (holding that the actual motivations of officers are irrelevant for

10

determining Fourth Amendment reasonableness).

The primary factor for determining whether a search is incident to an arrest is the time between the search and the actual arrest. See Anchondo, 156 F.3d at 1045 (noting that we consider whether the "arrest followed shortly after the search"); Lugo, 978 F.2d at 634 (a search is incident to an arrest if it is "contemporaneous" with the arrest). We note that courts have found that a search may be incident to an arrest in cases where the search and arrest were separated by times ranging from five to sixty minutes. See United States v. McLaughlin, 170 F.3d 889, 891-93 (9th Cir. 1999) (five minutes); United States v. Hrasky, 453 F.3d 1099, 1102-03 (8th Cir. 2006) (sixty minutes).

In this case, the officers had sufficient probable cause to arrest Mr. Torres-Castro prior to their entry into his home based on his alleged abusive conduct toward his juvenile girlfriend. Furthermore, the officers possessed the reasonable suspicion needed to support their protective sweep as required by Buie. Reasonable suspicion may arise when officers know an occupant has a weapon, has threatened to use it in an unlawful manner, and may be present in the residence. United States v. King, 222 F.3d 1280, 1284-85 (10th Cir. 2000). Here, the officers had information that Mr. Torres-Castro possessed a weapon and had threatened to use it on anyone who tried to take his girlfriend away. The officers visited his home to question him about his treatment of his girlfriend. In fact, Mr. Torres-Castro's girlfriend was present in the house at the time of the officers'

visit. While the officers did encounter Mr. Torres-Castro in the front room upon their entry to the home, he was not handcuffed or otherwise restrained. A reasonable officer could have feared that once Mr. Torres-Castro understood the nature of the officer's visit, he might seek to do harm with his weapon.

Furthermore, the officers did not know the identities of the other individuals in the house, let alone their relationship to Mr. Torres-Castro. The officers observed several individuals retreat into the back rooms of the house as they approached. Given the nature of Mr. Torres-Castro's threats to use a weapon, and the behavior of the other individuals in the home, we think a "reasonable officer would take precautions to make sure that no hidden threat was lurking in the house." See United States v. Hauk, 412 F.3d 1179, 1192 (10th Cir. 2005) (permitting a protective sweep where a second individual was thought to be present during an arrest for drug crimes).

The government does not argue that the district court's analysis was incorrect; rather, it argues that the court should reconsider its position that a protective sweep may only be performed incident to arrest and that this protective sweep would be justified under the expanded view of Buie. Aplee. Br. at 12-15, 18. Given the government's position on appeal, and because we hold below that the protective sweep was not the "but for" cause for the seizure of certain evidence, and that other evidence would have been inevitably discovered, we need not resolve the question of whether the protective sweep was incident to Mr.

12

Torres-Castro's arrest.

B.  Shotgun Shells, Shotgun and Admission of the Shotgun's Location

For evidence to be suppressed, Mr. Torres-Castro must first demonstrate that his Fourth Amendment rights were violated.  United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000).  Assuming, as we do for this portion of the opinion, that the protective sweep was not incident to the arrest, Mr. Torres-Castro has established the requisite Fourth Amendment violation.  But, Mr. Torres-Castro must also show a "factual nexus between the illegality and the challenged evidence."  Id.  In other words, Mr. Torres-Castro must show "but for" causation; that "the evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct."  Id.  If evidence is attributed to a Fourth Amendment violation by this causal relationship, it may be tainted.

"But for" causality is a necessary, but not a sufficient, requirement for suppression.  Hudson v. Michigan, 126 S. Ct. 2159, 2164 (2006).  Even if Mr. Torres-Castro can demonstrate that the evidence resulted from the protective sweep, the government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.  Nava-Ramirez, 210 F.3d at 1131.  In considering whether evidence seized is so attenuated from the illegality as to

13

dissipate any taint, we balance the "temporal proximity of the Fourth Amendment violation," any "intervening circumstances," and the "purpose and flagrancy of the official misconduct." United States v. King, 990 F.2d 1552, 1563-64 (10th Cir. 1993); see also Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (listing the three factors). If the government can demonstrate inevitable discovery, discovery by independent means, or attenuation, the evidence is not fruit of the poisonous tree and need not be suppressed. United States v. DeLuca, 269 F.3d 1128, 1132 (10th Cir. 2001).

With respect to the shotgun and his various statements made to the police, we conclude that Mr. Torres-Castro has not established a factual nexus between the protective sweep and that evidence. While there may be a factual nexus between the protective sweep and discovery of the shotgun shells, it is apparent from the district court's factual findings that the shells would have been inevitably discovered and, accordingly, should not be subject to suppression.

Those factual findings plainly support the conclusion that Mr. Torres-Castro voluntarily admitted the officers to his home. The statements from the girlfriend (involving domestic abuse and a gun) furnished a strong objective basis for the officers to ask Mr. Torres-Castro about the presence of a gun and to request permission to search his home for it. Likewise, having seen several individuals move from the front room deeper into the home, we think a reasonable officer would have asked the same questions and made the same request

14

regardless of a protective sweep. Even if the officers were actually motivated to question Mr. Torres-Castro about the gun because they discovered shells during the protective sweep, their subjective motivations are irrelevant because the Fourth Amendment turns on the objective reasonableness of the circumstances. See United States v. Carson, 793 F.2d 1141, 1149 (10th Cir. 1986) ("[T]he request itself, even if motivated by the fruits of the prior illegality, is not exploitation."). Furthermore, Mr. Torres-Castro was cooperative in identifying the location of the shotgun and in consenting to a search of the home for weapons. We find no evidence to suggest that he would have withheld his consent to search, absent the protective sweep.

Mr. Torres-Castro argues that because he knew the officers discovered shotgun shells during the protective sweep, this knowledge was "instrumental in his consenting to the search for the shotgun," because he knew "the police had discovered potentially incriminating evidence." Aplt. Br. at 38. He relies on United States v. Ward, 961 F.2d 1526, 1535 (10th Cir. 1992). Ward involved an illegal seizure of a person on a train, which was followed by that person's consent to search. Id. at 1534-35. In Ward, we held that the defendant's subsequent consent to search was tainted by the illegal seizure. Id. at 1534-45. In this case, however, there was no illegal seizure. Mr. Torres-Castro voluntarily allowed the officers into his home. Furthermore, the discovery of the shotgun shells was not inherently incriminating because the officers did not know at the time that it was

15

illegal for Mr. Torres-Castro to possess the shells, the shells could have belonged to any of the other individuals in the home, and the shells did not indicate that the shotgun that was subsequently found was an illegal sawed-off shotgun. In addition, Officer Guevara specifically informed Mr. Torres-Castro that he did not have to reveal the shotgun's location, further suggesting that the protective sweep was not the "but for" cause of Mr. Torres-Castro's identification of the location of the shotgun, consent to search, and immediate discovery of the shotgun. For these reasons, we reject Mr. Torres-Castro's argument that but for the protective sweep, the officers would not have asked him about the presence of the shotgun and would not have obtained his consent to search the house for weapons.

There does appear to be a factual nexus between the protective sweep and discovery of the shotgun shells. After all, the shells were located by Officer Elrick while he conducted the sweep. Regardless of this causal connection, however, the shells should not be suppressed because they would have been inevitably discovered. They were located in a clear plastic bag in an open closet in the bedroom where the shotgun was located. Because they were in plain view, the officers would have discovered the shells during their search for the shotgun, which we have already concluded would have occurred regardless of the protective sweep. Thus, the doctrine of inevitable discovery excepts the tainted shells from suppression. See Nava-Ramirez, 210 F.3d at 1131. Because inevitable discovery is itself an exception to suppression, we need not engage in

16

the balancing of factors that we use to determine attenuation. See id. (treating the attenuation analysis as distinct and separate from inevitable discovery and independent source); United States v. Haro-Salcedo, 107 F.3d 769, 773 (10th Cir. 1997) ("The inevitability of discovering evidence by lawful means removes the taint from evidence first discovered through unlawful means.") (citing Nix v. Williams, 467 U.S. 431, 444 (1984)).

C.  Post-Arrest Statements

Mr. Torres-Castro also argues that incriminating statements made after his formal arrest and Miranda warnings should be suppressed as fruit of the protective sweep. These statements are subject to the same analysis as the earlier discovered evidence and Mr. Torres-Castro's statement and consent to search for the shotgun. See United States v. Maez, 872 F.2d 1444, 1457 (10th Cir. 1989) (noting that statements made after custodial arrest are still subject to the exclusionary rule analysis).

We conclude that the statements made by Mr. Torres-Castro have no "but for" relationship to the protective sweep, for the same reasons his earlier statements relating to the shotgun lack such a relationship. In addition, Mr. Torres-Castro's post-arrest statements were further distanced from the protective sweep by the additional five to ten minutes it took Agent Ortega to arrive at the house and begin interviewing Mr. Torres-Castro. Furthermore, by the time Agent Ortega began his questioning, Mr. Torres-Castro had twice been warned that he

17

could refuse to answer questions, once by Officer Guevara, and once by Agent Ortega via a <u>Miranda</u> warning.  A <u>Miranda</u> warning itself may be a significant intervening circumstance that can break any factual nexus between an illegal search and subsequent incriminating statement.  <u>See</u> <u>Oregon v. Elstad</u>, 470 U.S. 298, 310-11 (1985) (noting that a careful administration of <u>Miranda</u> warnings can "cure the condition that rendered the [earlier] unwarned statement inadmissible").  Here, Agent Ortega administered such a warning.  He arrived on the scene after the protective sweep and discovery of the shotgun, and thus his warning to Mr. Torres-Castro was even more of an intervening act than the earlier one given by Officer Guevara.  Nevertheless, the encounter between Mr. Torres-Castro and the officers had been largely consensual up to Agent Ortega's arrival.  Accordingly, we see no basis to conclude that the protective sweep was the "but for" cause of the later incriminating statements.

AFFIRMED.