**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 19, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

RAMON RUBEN LOPEZ-CARILLO,

    Defendant-Appellant.

No. 12-6246
(D.Ct. No. 5:11-CR-00329-F-1)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]

_____

Before **BRISCOE**, Chief Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

_____

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument.

Appellant Ramon Ruben Lopez-Carillo pled guilty to one count of being illegally present in the United States, in violation of 8 U.S.C. § 1326(a), and one

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

count of being an unlawful alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5).  In pleading guilty, Mr. Lopez-Carillo reserved his right to challenge the district court's order denying his motion to suppress evidence.  He now appeals his convictions, claiming a violation of his Fourth Amendment rights during the search of his home and statements he gave following that search.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm Mr. Lopez-Carillo's convictions.

## I.  Factual and Procedural Background

The material facts surrounding the search of Mr. Lopez-Carillo's home and his statements are largely outlined in the district court's order on his motion to suppress and supported in the record on appeal.  On September 17, 2011, five law enforcement officers, connected with various agencies and acting as a team, went to the Oklahoma City residence rented by Mr. Lopez-Carillo to execute an administrative warrant for his arrest after learning of his illegal presence in the United States and prior criminal convictions, as shown on certain law enforcement databases.[1]  On arrival at Mr. Lopez-Carillo's house, Matt Daves, a Sergeant with the Oklahoma County Sheriff's Department, knocked on the front door, after which Mr. Lopez-Carillo's mother opened a side door to the house;

---

[1]  In searching a law enforcement database, known as Accurint, prior to the search, officers also associated Mr. Lopez-Carillo's mother, Maria Carillo, with the same address, and Mr. Lopez-Carillo later admitted she stayed there as much as a month at a time.

Sergeant Daves and Jason Swihart, an agent with the United States Immigration and Customs Enforcement Service (ICE), then walked to the side door to speak to her. Agent Swihart conversed with her in Spanish in a normal tone in the presence of Sergeant Daves, who does not speak Spanish. According to Sergeant Daves, she seemed confused as to why they were there as well as a little scared or nervous. After his conversation with her, Agent Swihart translated her statements directly to Sergeant Daves and later to a Homeland Security Investigations agent, Paul Masteller, explaining to them that Mrs. Carillo identified herself, confirmed she was Mr. Lopez-Carillo's mother, and stated her son was not there, but at work, and to go ahead and look for him in the home. Mrs. Carillo also made a gesture with her hand toward the house, after which Agent Swihart and Sergeant Daves entered; thirty to sixty seconds later, Agent Masteller also entered. According to two of the officers who later testified, Mrs. Carillo no longer seemed confused, was not startled that the officers were entering the home, did not attempt to stop them, and was not combative as they passed her at the threshold of the house. Instead, she seemed calm, not upset, and "quite cooperative."

David Gomez, a Hispanic, Spanish-speaking agent with ICE, who was stationed outside the home, proceeded toward the house after seeing Mrs. Carillo gesturing to the others to come in; as he looked into the house through the doorway, he identified himself to Mrs. Carillo, and she also gave him permission

to enter. Up to and during this time, none of the agents drew their weapons or acted in a threatening manner. Sergeant Daves was in his Sheriff's uniform; Agent Gomez wore army fatigue pants, a raid shirt and a placard saying "Police" and "ICE"; Agent Swihart wore clothing similar to Agent Gomez, including a raid shirt with "ICE" on it; and Agent Masteller had on blue jeans and an unidentified shirt.

When Agent Masteller entered the house, Agent Swihart and Sergeant Daves were standing in the entryway with Mrs. Carillo, but after Agent Gomez entered, Mrs. Carillo stationed herself at or near the kitchen table. Almost immediately, Mrs. Carillo offered Agent Gomez a seat, and they both sat down at the table where they developed a rapport and conversed in Spanish in a normal tone. During their conversation, the other agents were in and out of the kitchen area, sweeping through the home one room at a time in search of Mr. Lopez-Carillo.

During this time, Agent Gomez attempted to put Mrs. Carillo at ease by talking to her; he told her who he was and the reason he was there, and she confirmed Mr. Lopez-Carillo was her son and that he, her husband, and she lived there. She also told Agent Gomez her son was at work and her husband was undocumented and presented the I-94 card she received on entering the country, which Agent Gomez determined was valid, both on examination and after contacting the ICE dispatch office by cell phone. According to Agent Gomez, she

produced the I-94 card within a minute of their seated conversation.

Early in their encounter with her, Agent Gomez and Agent Swihart also asked Mrs. Carillo to call her son, which she did, telling Mr. Lopez-Carillo, "immigration [is] here and would like to talk to you." She then handed the phone to Agent Gomez, who identified himself, told Mr. Lopez-Carillo he was at his house, and said he would like to talk to him. Mr. Lopez-Carillo hung up, and even though Mrs. Carillo attempted to phone him at least two or three more times, he did not answer.

Sometime during Agent Gomez's conversation with Mrs. Carillo, she told him on her own volition to search the house, including Mr. Lopez-Carillo's room, and waved her arm toward the other rooms, stating something to the effect of, "there is his room, search the house, I've got nothing to hide." Agent Gomez admitted she appeared nervous but that she also began opening doors, again stating, "go ahead and search, look for him, he's not here." While Mrs. Carillo was never told she could refuse consent and was not given a consent to search form, at no time during her entire encounter with the officers did she ask them to stop searching or limit their search, and she even got up and opened a door for one of the agents. In addition, during her conversation with Agent Gomez and the search of the house by the other officers, Mrs. Carillo made coffee, obtained cigarettes and her medication located in the kitchen, and put a load of clothes in the washer. According to Agent Masteller, Mrs. Carillo did not "seem upset at

all."

In the meantime, the last room Agent Swihart and Sergeant Daves searched was Mr. Lopez-Carillo's unlocked bedroom, which contained his belongings. When Agent Swihart walked around the bed, he saw a shotgun in plain view on the floor by the bed's edge, after which Sergeant Daves picked it up and secured it; the firearm contained ammunition in its chamber as well as five additional rounds. Agent Gomez later testified the gun was found in Mr. Lopez-Carillo's room after Mrs. Carillo told him they could search the house and that she verified the bedroom, where the gun was found, belonged to Mr. Lopez-Carillo.

Agent Gomez then conversed with a female neighbor and ex-relative who Mrs. Carillo told him might have some information on her son's job location; Agent Gomez explained to the neighbor who they were and why they were there. The neighbor then left to get Mr. Lopez-Carillo and returned with him in her vehicle. Agent Gomez initiated contact with him in the driveway, speaking Spanish to him; at that time, Agent Gomez identified himself and asked Mr. Lopez-Carillo for his name and nationality, if he knew why they were there, whether he spoke English, and if he had ever been deported. Mr. Lopez-Carillo gave his name and date of birth and confirmed he had previously been deported and that he spoke a little English. At that time, Agent Gomez arrested him and read him his *Miranda* rights in Spanish, and Mr. Lopez-Carillo stated he understood his rights. During this encounter, Agent Gomez did not raise his

voice or display a gun, and Mr. Lopez-Carillo appeared to know what was going on. Sergeant Daves then took possession of Mr. Lopez-Carillo, and, after he placed him in his patrol car, he read him his *Miranda* rights in English, which Mr. Lopez-Carillo said he understood. At that time, Mr. Lopez-Carillo confirmed in English he lived in the house and verified the location of his bedroom.

Shortly thereafter, a federal grand jury returned an indictment charging Mr. Lopez-Carillo with one count of being illegally present in the United States, in violation of 8 U.S.C. § 1326(a), and one count of being an unlawful alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5). Mr. Lopez-Carillo filed a motion to suppress the shotgun and the statements he made on his arrival to his house, arguing law enforcement illegally searched his home and seized the gun, making the resulting incriminating evidence tainted and "fruit of the poisonous tree." The government opposed the motion.

At an evidentiary hearing on the motion to suppress, the government presented the testimony of Agent Masteller, Agent Gomez, and Sergeant Daves but did not present the testimony of Agent Swihart, who was out of the country escorting a foreign national back to Kenya. Agent Masteller testified as to what Agent Swihart told him Mrs. Carillo said with respect to her initial consent to enter and search the house but admitted he spoke limited Spanish, did not participate in their conversation, and could not independently verify her consent. Sergeant Daves, who was present during Agent Swihart's conversation with Mrs.

-7-

Carillo, similarly testified as to the consent statement Mrs. Carillo made, as interpreted by Agent Swihart, but confirmed he did not speak Spanish either. While the district court credited their entire testimony, it determined neither of them understood the conversation in Spanish, and, therefore, that portion of their testimony did not meet the evidentiary standard for the purpose of showing Mrs. Carillo gave Agent Swihart voluntary consent to search the house. While the district court made several findings of fact, as discussed hereafter, it asked the parties to submit additional briefing on the issue of the validity of the second consent. In its brief, the government provided the affidavit of Agent Swihart for the purpose of establishing the initial consent given by Mrs. Carillo was valid and argued that, even without Agent Swihart's testimony, Mrs. Carillo's later spontaneous consent given to Agent Gomez purged any taint from the initial consent because a break or attenuation occurred in the causal connection between the two.

In denying Mr. Lopez-Carillo's motion to suppress, the district court determined Mrs. Carillo, who stayed at the home when she was in the United States, had both actual and apparent authority to consent to the search. Next, it determined the government failed to prove she gave Agent Swihart consent to search but that any taint from such invalid consent was removed by the consent Mrs. Carillo voluntarily gave Agent Gomez shortly thereafter. With respect to its holding the initial consent given to Agent Swihart was invalid, the district court

relied on our proposition in *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003), that consent to search must be established by "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." It applied this in rejecting both the testimony of the non-Spanish-speaking agents as to the initial consent translated to them and Agent Swihart's affidavit, which it determined was not subject to cross-examination and therefore could not be relied on. In turn, the district court credited Agent Gomez's testimony concerning his conversation with Mrs. Carillo and found such testimony established she validly consented to a search of the residence at or near the time of her initial contact with him.

In determining the consent given to Agent Gomez was not tainted by the preceding Fourth Amendment violation, it found Mrs. Carillo was not influenced by the illegal search and her consent was sufficiently attenuated from the government's illegal conduct when considering the factors of temporal proximity, intervening circumstances, and official misconduct. In finding she was not influenced by the initial tainted search, it found nothing in the evidence suggested Agent Swihart or anyone else intimidated her or that Mrs. Carillo's consent was the product of duress or coercion, but, rather, she gave her consent to Agent Gomez with the view of getting all of the agents out of the house, knowing they would not find her son there, and that she gave such consent on her own volition as part of her cordial conversation with Agent Gomez. Finally, the district court

applied the inevitable discovery exception in determining the valid consent given

Agent Gomez would have led to the inevitable discovery of the gun. It then

denied Mr. Lopez-Carillo's motion to suppress. Thereafter, Mr. Lopez-Carillo

pled guilty, reserving his right to appeal the district court's denial of his motion

to suppress evidence. Following a sentencing hearing, the district court sentenced

Mr. Lopez-Carillo to twenty-seven months imprisonment.

## II. Discussion

On appeal, Mr. Lopez-Carillo continues to argue law enforcement illegally

searched his home and seized the gun without obtaining either a search warrant or

valid consent, and therefore, the district court abused its discretion in holding the

consent Mrs. Carillo gave to Agent Gomez removed any taint from the initial

illegal consent and search. In making this argument, Mr. Lopez-Carillo claims no

required break or attenuation occurred in the connection between the invalid and

valid consents sufficient to remove the taint, as demonstrated by the close

temporal proximity between both consents. He also claims the government failed

to carry its burden to provide evidence to demonstrate his statements, both before

and after a reading of his *Miranda* rights, were not induced or influenced by the

illegal search or otherwise sufficiently attenuated from the government's illegal

conduct, either by temporal proximity, intervening circumstances, or the purpose

and flagrancy of official misconduct. The government opposes the appeal.

We begin with the applicable principles and our standard of review. We

review a district court's denial of a motion to suppress evidence in the light most favorable to the government and accept the court's factual findings unless clearly erroneous. *See United States v. DeJear,* 552 F.3d 1196, 1200 (10th Cir. 2009). We review de novo the reasonableness of the government's actions under the Fourth Amendment, keeping in mind the government bears the burden of proving the reasonableness of a search or seizure. *See United States v. Kitchell*, 653 F.3d 1206, 1216 (10th Cir.), *cert. denied*, 132 S. Ct. 435 (2011). In turn, a defendant must demonstrate his Fourth Amendment rights were violated and that a factual nexus exists between the illegality which occurred and the challenged evidence. *See United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). In other words, the defendant must show the challenged seizure was illegal, and may do so by establishing the "evidence sought to be suppressed would not have come to light but for the government's unconstitutional conduct." *Id.* (internal quotation marks omitted). In considering a motion to suppress, "[t]he credibility of witnesses, the weight accorded to evidence, and the reasonable inferences drawn therefrom fall within the province of the district court." *DeJear,* 552 F.3d at 1200. In reviewing a district court's ruling on a motion to suppress, we may affirm "on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Harman v. Pollock*, 586 F.3d 1254, 1259 (10th Cir. 2009) (quoting *Lambertsen v. Utah Dep't of Corr.,* 79 F.3d 1024, 1029 (10th Cir. 1996)).

While a warrantless search of a suspect's home is presumed to be an unreasonable violation of the Fourth Amendment, *see Payton v. New York*, 445 U.S. 573, 586 (1980), a warrantless search maybe reasonable if it fits within the established consensual search exception to the warrant requirement, *see Florida v. Jimeno*, 500 U.S. 248, 250 (1991). In cases involving a third party, he or she must have actual or apparent authority to consent to the search, and the consensual search must be freely and voluntarily given. *See United States v. Sanchez*, 608 F.3d 685, 689 (10th Cir. 2010); *Taverna*, 348 F.3d at 878. Whether a party freely and voluntarily gives consent to a search is a question of fact determined from the totality of the circumstances. *Sanchez,* 608 F.3d at 689. For consent to be voluntary, the government must receive either express or implied consent. *See United States v. Jones*, 701 F.3d 1300, 1320-21 (10th Cir. 2012).

Implied consent to enter a home is no less valid than explicit consent. *See id.* Consent "must be clear but it need not be verbal. Consent may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer." *United States v. Guerrero*, 472 F.3d 784, 789-90 (10th Cir. 2007). "The focus is not whether [one] subjectively consented, but rather, whether a reasonable officer would believe consent was given" as "inferred from words, gestures, or other conduct." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009). However, whether consent is implied or express, it cannot be "coerced, by explicit or implicit means,

-12-

by implied threat or covert force" and "is voluntary if there is no indication of either force or intimidation." *United States v. Kimoana*, 383 F.3d 1215, 1225 (10th Cir. 2004) (internal quotation marks omitted). Circumstances which may indicate improper duress or coercion include "physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the [one consenting], the number of officers on the scene, and the display of police weapons." *United States v. Harrison,* 639 F.3d 1273, 1278 (10th Cir. 2011) (internal quotation marks omitted). In addition, other factors to consider include whether the officer obtains consent pursuant to a claim of lawful authority or informs the person of the right to refuse consent. *See id.*

In this case, we agree with the district court that Mrs. Carillo had the requisite authority to consent to the search. We disagree, however, with its determination the government failed to meet its burden in proving Mrs. Carillo gave Agent Swihart clear and unequivocal consent. In making this determination, the district court relied on our decision in *Taverna* and the general proposition that consent to search must be established by "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given." 348 F.3d at 878 (internal quotation marks omitted). While *Taverna* provides the general standard of proof required in consent cases, it does not discuss the applicable hearsay rules.

-13-

Generally, the Confrontation Clause restricts the admission of a testimonial statement against a defendant if the declarant does not testify, unless the defendant has had the opportunity to cross-examine the witness or the statement is admitted for purposes other than to establish the truth of the matter asserted. *See United States v. Pablo*, 696 F.3d 1280, 1287-88 (10th Cir. 2012). However, as the government argued before the district court, the Supreme Court has made it clear hearsay is admissible in suppression hearings. *See United States v. Matlock*, 415 U.S. 164, 172-77 (1974). *See also United States v. Sanchez,* 555 F.3d 910, 922 (10th Cir. 2009) (holding "the law is clear that hearsay evidence is admissible at suppression hearings"); *United States v. Miramonted*, 365 F.3d 902, 904 (10th Cir. 2004) (relying on *Matlock* for the proposition that "[r]ules of evidence applicable in criminal jury trials do not govern at hearings before a judge to determine pre-trial evidentiary matters, such as the admissibility of evidence at trial"). As a result, the restriction in the Confrontation Clause against admission of testimonial statements, like Agent Swihart's affidavit, is not implicated here. *See Matlock*, 415 U.S. at 174-75 (relying on *McCray v. Illinois*, 386 U.S. 300, 312-13 (1967), for the proposition use of hearsay at a suppression hearing does not implicate a defendant's right to confrontation under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment). In this case, the government provided Agent Swihart's affidavit for the purpose of attesting to the accuracy of Agent Masteller's testimony as to Mrs. Carillo's consent, and Mr. Lopez-Carillo

-14-

did not object to its submission in his reply. Under these circumstances and pursuant to *Matlock* and our precedent, his affidavit constitutes admissible evidence and clearly illustrates Mrs. Carillo's consent to search the home for her son was unequivocal, specific, and freely and intelligently given, as required by *Taverna*. *See* 348 F.3d at 878.

Not only was Agent Swihart's affidavit admissible for the purpose of the suppression hearing, but the testimony of Agents Masteller and Daves was also admissible and fully corroborated Agent Swihart's affidavit. As a result, even if their testimony constituted hearsay, the same rule allowing hearsay evidence in suppression hearings applies. For these reasons, the district court erred in refusing to consider the officers' testimony and affidavit. *See Miramonted*, 365 F.3d at 905 (holding district court improperly excluded hearsay evidence in ruling on motion to suppress). Despite this error, we may affirm the district court's denial of Mr. Lopez-Carillo's motion to suppress based on such erroneously excluded testimony and affidavit. *See Harman*, 586 F.3d at 1259.

In addition, even if we discount Agent Swihart's affidavit or Sergeant Daves's and Agent Masteller's testimony on Mrs. Carillo's initial consent to search the house, as the district court did in this case, the actions taken by Mrs. Carillo demonstrate an implied consent to search the house. As previously discussed, consent may be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable

officer, *see Guerrero*, 472 F.3d at 789-90, and "a reasonable officer would believe consent was given" as "inferred from words, gestures, or other conduct," *Pena-Ponce*, 588 F.3d at 584. Certainly, even without Agent Swihart's affidavit as to his conversation with Mrs. Carillo or consideration of Sergeant Daves's and Agent Masteller's testimony on the translation of that conversation, it is clear the officers reasonably believed Mrs. Carillo gave her consent or acquiesced, as demonstrated by her gesturing with her hand to enter the house following their conversation and her other actions. These include the fact she no longer seemed confused, was not startled by their entry into the home, did not attempt to stop them from entering, and was not combative as they passed her at the threshold of the house. Instead, she seemed calm, not upset, and quite cooperative. Immediately thereafter, while she conversed with Agent Gomez, she did not object to the other officers sweeping the house in search of her son or otherwise retract her consent or ask them to stop searching or limit their search. Instead, she got herself some coffee and cigarettes, got out her medication, put a load of clothes in the washer, and answered all of Agent Gomez's questions while the other officers conducted their search. In addition, on her own volition, Mrs. Carillo gave Agent Gomez, who was not present when she initially consented to the search, express permission to search, waving her arm toward the other rooms and stating, "there is his room, search the house, I've got nothing to hide." She even opened a door or two for at least one of the agents.

-16-

Further, nothing in the record shows her consent was coerced, by explicit or implicit means, or by implied threat or covert force, including physical mistreatment, violence, threats, promises or inducements, deception, or trickery. Similarly, nothing in the record demonstrates Mrs. Carillo lacked the physical and mental condition and capacity to consent. While five officers were on the scene in various types of uniform, including at least one in body armor, the record establishes that none of the officers raised their voices or displayed their weapons and that Mrs. Carillo seemed at ease as she sat at the kitchen table. *See United States v. Iribe*, 11 F.3d 1553, 1557 (10th Cir. 1993) (holding that even though "the presence of more than one officer increases the coerciveness of an encounter" the presence of five officers did not outweigh numerous other factors indicating individual voluntarily consented to search of house). Finally, even though it does not appear any of the officers informed Mrs. Carillo of her right to refuse consent, we cannot say Mrs. Carillo's consent, express or implied, was obtained by impermissible means when all of the factors are considered.

For these reasons, Mr. Lopez-Carillo has not demonstrated the seizure of his gun was illegal. As a result, we need not address the issue of inevitable discovery or whether the express consent given to Agent Gomez was tainted by a preceding illegal search or seizure as determined by temporal proximity, intervening circumstances, or the purpose and flagrancy of official misconduct.

As to the incriminating statements Mr. Lopez-Carillo made to the officers,

nothing in the record supports his claim officers violated his Fourth Amendment rights. In this case, the officers knew he was in the country illegally prior to their arrival at his house, as demonstrated by the information they obtained through a law enforcement database and the administrative warrant they were serving for his arrest. After they arrived, Mrs. Carillo called her son and told him, "immigration [is] here and would like to talk to you" and then handed the phone to Agent Gomez, who identified himself and told Mr. Lopez-Carillo he was at his house and would like to talk to him. Despite receiving this information, Mr. Lopez-Carillo nevertheless accompanied his neighbor back to his house, where he knew the officers were waiting for him. He was met by Agent Gomez in his driveway, and, after Agent Gomez identified himself, Mr. Lopez-Carillo answered his questions, including giving his name and date of birth as well as admitting he had previously been deported when asked about his nationality and deportation status. During this encounter, Agent Gomez spoke Spanish for the benefit of Mr. Lopez-Carillo, who spoke only a little English, and Agent Gomez did not raise his voice or display a gun. In turn, the evidence established Mr. Lopez-Carillo appeared to know what was going on when he answered the questions.

Clearly, Mr. Lopez-Carillo's encounter with Agent Gomez in his driveway was consensual. "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005)

(internal quotation marks omitted). Consent is a question of fact determined by considering the totality of the circumstances, *see United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999), and during such a consensual encounter, "[a]n officer is not required to inform a suspect that [he] does not have to respond to ... questioning or that [he] is free to leave," *Bradford*, 423 F.3d at 1158. In addition, "[i]n the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment" or ask questions "relating to one's identity*." Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humboldt County*, 542 U.S. 177, 185 (2004). Moreover, asking one his or her name, date of birth, place of birth, and immigration status does not violate the Fourth Amendment if these questions reasonably relate to the reasons for the initial stop or detention. *See Muehler v. Mena*, 544 U.S. 93, 96, 100-01 (2005) (holding officer's questions on woman's name, date of birth, place of birth, and immigration status, where woman was found in residence subject to search warrant and where officers knew illegal immigrants were housed, did not require reasonable suspicion or otherwise violate the Fourth Amendment).

It follows the same principle applies to the consensual encounter presented here. Given the officers already knew Mr. Lopez-Carillo's deportation status and were serving an administrative warrant based on that status, it was not unreasonable to ask Mr. Lopez-Carillo his name and date of birth to confirm his identity and to pose a question as to his nationality and deportation status. This

encounter did not violate the Constitution, and Mr. Lopez-Carillo's statements on his deportation status merely corroborate what officers already knew and supports his conviction for being illegally present in the United States, in violation of 8 U.S.C. § 1326(a).

As to his contested conviction for being an unlawful alien in possession of a firearm, in violation of 18 U.S.C. § 922(g)(5), Mr. Lopez-Carillo made his incriminating statement identifying his bedroom, where officers found his gun, only after his arrest and a reading of his *Miranda* rights in both Spanish and English. Because he intelligently waived those rights before providing his inculpatory statement, officers did not violate his constitutional rights. Moreover, even without the information he provided, his mother had previously confirmed the location of his bedroom, as corroborated by the contents contained therein which belonged to him, and Mr. Lopez-Carillo offered no contrary evidence at the suppression hearing. This evidence is sufficient to support his firearm conviction.

Finally, because no prior taint occurred as a result of the search of his home, the government was not required, as Mr. Lopez-Carillo contends, to prove his statements were not induced or influenced by the illegal search or otherwise sufficiently attenuated from the government's illegal conduct. As a result, nothing about the officers' questions resulted in a Fourth Amendment violation nor did any prior taint occur rendering Mr. Lopez-Carillo's statements constitutionally inadmissible.

### III. Conclusion

For the foregoing reasons, we **AFFIRM** Mr. Lopez-Carillo's convictions.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge