FILED
United States Court of Appeals
Tenth Circuit

November 15, 2018

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

WALT JASPER SAMUEL SHRUM,

    Defendant - Appellant.

No. 17-3059

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:15-CR-10032-JTM-1)**

Daniel T. Hansmeier, Appellate Chief (Melody Brannon, Federal Public Defender and Timothy J. Henry, Assistant Federal Public Defender, with him on the briefs), Kansas City, Kansas, for Defendant-Appellant.

Jared S. Maag, Assistant United States Attorney (Thomas E. Beall, United States Attorney, with him on the brief), Topeka, Kansas, for Plaintiff-Appellee.

Before **MATHESON**, **BALDOCK**, and **EID**, Circuit Judges.

**BALDOCK**, Circuit Judge.

Following the unexpected death of Defendant Walt Shrum's common law wife at the couple's home around 5:30 a.m. on March 11, 2015, police officers in Kingman, Kansas "secured" the home, prohibiting Defendant access. Approximately three hours later and without access to his home, Defendant signed a consent to

search form permitting an investigator from the Kingman County Sheriff's Office (KCSO) to enter his home for the express purpose of retrieving his deceased wife's medication in anticipation of an autopsy. While in the home, the investigator saw ammunition in plain view inside an open bedroom closet. After returning to headquarters, the investigator learned Defendant was a convicted felon and recalled seeing the ammunition in the closet. Several hours later, the investigator, based on what he had seen and learned, contacted a federal agent and asked him to obtain a search warrant for Defendant's home. A federal magistrate judge issued the warrant at 10:00 p.m. A late night search of the home, which local authorities still would not permit Defendant to access, uncovered not only the ammunition but also two loaded firearms and 4.4 grams of suspected methamphetamine.

A grand jury subsequently charged Defendant with two counts of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), one count of being a felon in possession of ammunition, again in violation of § 922(g)(1), and one count of possessing methamphetamine in violation of 21 U.S.C. § 844(a). Following the district court's denial of his motion to suppress the incriminating evidence used to charge him, Defendant entered a conditional guilty plea to one count of being a felon in possession of a firearm. After receiving a sentence of time served, Defendant appealed the district court's denial of his motion to suppress. Our jurisdiction arises under 28 U.S.C. § 1291. This appeal presents us with two questions: Did the initial securing of Defendant's home constitute an unreasonable seizure in violation of the

Fourth Amendment? And if so, did such seizure taint the incriminating evidence ultimately uncovered in the warrant search of his home? We answer both questions yes, and reverse.

## I.

The historical facts are not in dispute. Defendant and his wife Candice Hill were at their home in the early morning hours of March 11, 2015. Candice, who had just showered, was not feeling well. Shortly after telling Defendant she was very hot, she experienced a seizure and lost consciousness. At 4:54 a.m., Defendant phoned 911 to report a medical emergency. Defendant informed the 911 operator that Candice was thirty years old, was not breathing, and may have overdosed on prescription medication. Within five minutes, Captain Paul Hinton of the Kingman Police Department (KPD) arrived on the scene. Defendant was performing CPR on Candice in the bedroom. Captain Hinton relieved Defendant until EMS arrived at 5:11 a.m. About twenty-five minutes later, the ambulance, accompanied by everyone at the scene including Defendant, departed for the hospital a short distance away. Medical authorities pronounced Candice dead at 5:45 a.m.

According to a "Crime Scene Entry Log Sheet," KPD Sergeant Travis Sowers "secured" Defendant's home after arriving on the scene at 6:19 a.m. Sergeant Sowers next phoned Dustin Cooke, an investigator with the KCSO. A few minutes later, Investigator Cooke received a call from the KCSO assigning him the case. The police dispatch report indicates Investigator Cooke arrived at the hospital around

3

6:49 a.m. At the suppression hearing, Investigator Cooke testified as to the initial information he received on the incident: "I was told that they had a 30-year-old female that . . . it was initially a medical call, and that it needed to be investigated until otherwise; that it was *not* a suspicious death." (emphasis added).

Investigator Cooke asked Defendant, who had not yet returned home but remained at the hospital with Candice's body, to accompany him to the Kingman County Law Enforcement Center to discuss the circumstances surrounding her death. Defendant agreed. When later questioned about any information he may have had at this point regarding the cause of Candice's death, Cooke responded, "I didn't have anything." Investigator Cooke escorted Defendant to a small interview room where he began questioning him shortly after 7:00 a.m. The audio tape recording of the interview reveals Defendant was coherent but frequently overwrought with emotion. Cooke permitted Defendant to make and receive phone calls during the interview. About thirteen minutes into the interview, Defendant phoned a female friend he identified as Teresa. When Teresa told Defendant that she "might be over sometime this morning," Defendant stated, "I ain't home yet because they ain't lettin' me go home yet. I'm up here at the Sheriff's Office." Defendant told Investigator Cooke that he wanted an autopsy performed to determine the cause of Candice's death.

The interview lasted until around 9:20 a.m. with a thirty minute break beginning about 8:37 a.m. During the break, Investigator Cooke learned that the coroner had inquired about Candice's medication as well as other medication in the

4

home. Shortly after the interview resumed around 9:05 a.m., Investigator Cooke told Defendant the autopsy was scheduled for 1:30 p.m. that day in nearby Wichita. Cooke stated he would need to retrieve Candice's medication to determine if she took too many pills before she seized. He also told Defendant he wanted to help Defendant get his dogs out of the home. Defendant said he would cooperate because he wanted to know why Candice died. He mentioned she may have overdosed on Adderall. Investigator Cooke told Defendant he was going "to ask for your consent to get her medication." Defendant responded with a question: "You gonna go with me?" Cooke answered, "Yeah, and we're gonna go here in just a second."

Investigator Cooke also informed Defendant, "I'm gonna go ahead and hold onto your house as a scene, okay, until I get done with the autopsy." Defendant responded, "That's fine, cause I told the landlord . . . and he said any way he could help me, he said don't worry about nothin'." At the suppression hearing, Investigator Cooke described the discussion:

> Q. And at some point did you advise Mr. Shrum that you needed to hold onto the house, at least for that day?
> A. Yes.
> Q. Why did you say that?
> A. Just because there was a 36-year-old female that just goes into a code is not a common—it's not a normal death. It does happen, but we have to investigate as to why that happened, so securing anything that may have given us information into that was the reason for the scene being held.
> Q. All right. And did you tell Mr. Shrum that you were going to need to hold onto the house for a little while?
> A. Yes I did.

5

Q.    And what was his response to that?
A.    Anything that I can do to help. . . .

Investigator Cooke told Defendant he was "going to do what's called a consent to search and I'm just going in to retrieve the medication." Defendant quickly responded, "I can't do it unless I have an attorney go over it." Defendant then began to sob, "I wanna know what happened to her. I ain't got nothin' to hide from you people. She's my baby, she's my everything. I know you have to."[1] For the next few minutes, Investigator Cooke and Defendant discussed Candice's ex-husband and family before Cooke returned to the topic of Defendant's home: "Let's run over to the house. Let's get your dogs. Let's get the medication." Defendant suggested he feed his dogs and leave them in the house but Cooke told him the dogs could not stay there: "I don't want to leave them in the house not being taken care of." Cooke explained to Defendant, "Well, I'm hoping that this is a temporary thing maybe not but through the end of this afternoon, um, to know what's going on."

Defendant sobbed some more while he reminisced about Candice and how much he missed her. Investigator Cooke again returned the conversation to Defendant's home: "Let's go get your dogs. Let's get this medication. And that way I can start moving forward with today and getting to the autopsy and getting the

---

[1] At the suppression hearing, Investigator Cooke testified that after Defendant mentioned he wanted an attorney to review the consent form, Defendant "in what was a joking manner to me initially was, quote, 'Shit, I'm just kidding,' and we moved on." Defendant's reported statement is inaudible on the interview tape.

meds to the doctor and stuff like that . . . ." Defendant again expressed concern that Candice may have taken too many pills and told Cooke one of her medicine bottles was empty. Investigator Cooke asked if the empty bottle was in the house and Defendant said he believed so. Cooke inquired as to the location of the bottle, reminding Defendant, "I can't let you go in the house. I'll just tell you I can't let you go in the house, but if you'll tell me where that stuff is." Defendant responded that his medication was on the kitchen counter and Cooke stated he wanted to retrieve Defendant's medication as well. The two men then discussed the location of Candice's medication. Defendant thought it might be on the bedside table in the master bedroom. Investigator Cooke stated: "I'll look when we get over there but I want you to go with me. I'll have you sign this consent so I can get your medication, her medication, . . . ."

The KPD Crime Scene Entry Log shows Investigator Cooke, Defendant, and Defendant's friend, Denise Niederman, arrived at Defendant's home at 9:30 a.m. Investigator Cooke placed the consent to search form on the hood of his squad car. Cooke wrote "Retrieve Medication" on the form. He read and explained the form to Defendant. Defendant indicated he understood, signed the form, and provided Cooke a key for entry. At some point, Defendant asked Investigator Cooke if he could go inside his home to urinate. Cooke said no and later acknowledged he forced Defendant to "relieve himself outside the house where there were other people standing around." Once inside the home, Investigator Cooke let the dogs out and

7

retrieved Defendant's walking stick. Consistent with the information he obtained from Defendant during the interview, Cooke found prescription medication in the kitchen and in the master bedroom. Cooke gave Defendant his medication and kept Candice's medication for the coroner.

Investigator Cooke was inside Defendant's home between ten and fifteen minutes. The entry log shows Cooke departed the scene at 10:05 a.m. while Defendant and Niederman departed at 10:07 a.m. The log indicates Cooke entered the home to "retrieve medications / dogs." Neither Defendant nor Niederman were permitted to enter the home. While in the home, Cooke took fifty-six photographs of the kitchen and bedroom from various angles.[2] One of the photographs depicted ammunition in plain view in the bedroom closet. Cooke testified the closet door was open when he entered the bedroom. Back at headquarters prior to the scheduled autopsy, another officer reminded Cooke that Defendant was a convicted felon:

> Q. At some later point did you realize that Mr. Shrum was a convicted felon?
> A. I did, and there was two things that kind of sparked that: One, you heard in the interview where it come to my recollection and he even said it was almost six years ago that he and I had talked; and then the other officer that actually was assigned to that case made a comment, he says, you know, I think he was a felon and then it dons [sic] on me, wait a second, I saw ammo in the house. So I go back to my pictures and I'm like, there's the

---

[2] Investigator Cooke testified he took the photographs to (1) document the items he collected and (2) document that he did not remove items other than medication from the home.

8

ammunition, and that's what led into this investigation.[3]

Investigator Cooke attended Candice's autopsy in Wichita that afternoon at 1:30 p.m.[4] The autopsy lasted approximately two hours. That evening, Cooke contacted Agent Neil Tierney from the Wichita branch of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF). Cooke asked Tierney to obtain a search warrant for Defendant's home based on the ammunition in Defendant's closet and his status as a convicted felon. A federal magistrate judge issued the warrant at 10:00 p.m. The Crime Scene Entry Log indicates three ATF agents, including Agent Tierney, accompanied by Investigator Cooke and Sergeant Sowers, executed the warrant beginning at 11:18 p.m. The search concluded at 1:20 a.m. on March 12, 2015. According to the Justice Department's "Report of Investigation," law enforcement seized the following items from Defendant's home: (1) a loaded 12-gauge pump shotgun, (2) a loaded .45-caliber semi-automatic rifle, (3) an additional 806 rounds of live ammunition, (4) six glass paraphernalia pipes with residue, and (5) approximately 4.4 grams of suspected methamphetamine.

II.

---

[3] Defendant's Presentence Report indicates he was convicted in 2001 of making false statements to the federal government and in 2003 of being a felon in possession of a firearm. In 2010, Defendant's criminal conduct came to the attention of the KPD when he was charged with misdemeanor theft of a lawn mower by deception.

[4] According to the district court, the autopsy found the cause of Candice's death to be methamphetamine intoxication.

9

Prior to the suppression hearing, the focus of Defendant's motion to suppress was his purported consent to search the home and the scope of this consent. But Defendant also argued, albeit inartfully, that law enforcement illegally seized his home immediately after Candice's death. Following the hearing, the district court provided some "preliminary thoughts" to the parties that also focused on Defendant's consent and its scope. When asked if additional briefing was necessary before the court rendered its decision, defense counsel reminded the court that one of Defendant's prior arguments was that the police seized his home without a warrant from very early in the morning until very late at night on the day of Candice's death: "I would submit . . . that a big part of the motion is not just what happened inside [the home], . . . but the bottom line is . . . that they secured that house, prevented [Defendant] access, . . . and that simply cannot be done without a warrant . . . ."

The court subsequently granted Defendant's request for further briefing. In his supplemental brief, Defendant quoted directly from the Supreme Court's decision in *Segura v. United States*, 468 U.S. 796, 804–05 (1984), which in turn quoted from *Wong Sun v. United States*, 371 U.S. 471, 488 (1963):

> Evidence obtained as a direct result of an unconstitutional search or seizure is plainly subject to exclusion. The question to be resolved when it is claimed that evidence subsequently obtained is "tainted" or is "fruit" of a prior illegality is whether the challenged evidence was "come at by exploitation of [the initial] illegality or instead by means *sufficiently distinguishable* to be purged of the primary taint."

(citation omitted) (brackets and emphasis in original). Defendant concluded by

10

explaining: "Although *Segura* ultimately upheld the search in that case, its analysis and reasoning support an opposite conclusion here . . . . The later search is indelibly tied to the initial illegal seizure of [Defendant's] home . . . ."[5]

In denying Defendant's motion to suppress, however, the district court never asked whether an illegal seizure tainted Defendant's consent to search and the incriminating evidence Investigator Cooke witnessed as a consequence thereof, a taint in turn sufficient to invalidate the subsequent search warrant and its "fruits." Instead, the court held the seizure of Defendant's home did not violate the Fourth Amendment[6]:

> [G]iven the unexpected death of [Candice], the subsequent establishment of probable cause after Investigator Cooke observed the ammunition and learned of defendant's felon status, and the time it took to coordinate between state and federal law enforcement to secure a search warrant, the court finds that the "seizure" of defendant's residence was reasonable under the Fourth Amendment.

---

[5] *Wong Sun*, of course, established the "fruit of the poisonous tree" doctrine which we will have more to say about shortly. In *Segura*, the Supreme Court rejected application of the doctrine and held that despite an illegal entry into a home, the Fourth Amendment did not require suppression of evidence seized later from the home pursuant to a valid search warrant issued on information the police obtained *before* entry into the home. "[T]he exclusionary rule has no application where the Government learned of the evidence 'from an independent source.'" *Segura*, 468 U.S. at 805 (brackets omitted) (quoting *Wong Sun*, 371 U.S. at 487).

[6] The district court also held Defendant's subsequent consent to a limited search of his home was knowing and voluntary, and Investigator Cooke did not exceed the scope of this consent by photographing the interior of Defendant's home. The court concluded, however, that even if Cooke exceeded the scope of Defendant's consent by taking photos, Cooke's observation of the ammunition alone, apart from any photographs, established probable cause for issuance of the search warrant.

11

## III.

The Fourth Amendment provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause . . . ." U.S. Const. amend. IV. A defendant seeking to suppress evidence based on a warrantless seizure of his property bears the burden of proving the same.[7] *United States v. Carhee*, 27 F.3d 1493, 1496 (10th Cir. 1994); *see also United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017) (recognizing that a defendant bears the burden of proving whether and when the Fourth Amendment was implicated). If the defendant meets his burden of establishing a warrantless seizure, the burden then shifts. The Government must establish the warrantless seizure was reasonable. *Carhee*, 27 F.3d at 1496; *see also United States v. Finefrock*, 668 F.2d 1168, 1170 (10th Cir. 1982) (recognizing that when a defendant challenges a warrantless seizure, the Government bears the burden of justifying its actions). Where, as here, the underlying facts are undisputed, we review de novo the question of whether those facts establish a warrantless seizure within the meaning of the Fourth Amendment and, if necessary, the question of when such seizure occurred. *United States v. Roberson*, 864 F.3d 1118, 1121 (10th Cir. 2017). We also review de novo the ultimate determination of reasonableness under the Fourth

---

[7] The controlling standard of proof at a suppression hearing is proof by a preponderance of the evidence. *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984).

Amendment.  *United States v. De La Cruz*, 703 F.3d 1193, 1195–96 (10th Cir. 2013).

A.

The Supreme Court has told us a Fourth Amendment "seizure" occurs "when there is some meaningful [government] interference with an individual's possessory interests in . . . property."  *United States v. Jacobsen*, 466 U.S. 109, 113 (1984); *see also United States v. Hill*, 805 F.3d 935, 937 (10th Cir. 2015).  Given the Supreme Court's description of a seizure, we have little difficulty concluding local law enforcement in Kingman, Kansas seized Defendant's home *no later* than 7:02 a.m. on March 11, 2015.  The police dispatch report indicates Sergeant Sowers arrived at Defendant's home at 6:19 a.m.  The KPD Crime Scene Entry Log indicates he promptly began securing the scene upon arrival.  According to the dispatch report, the police were still "securing [the] scene" at 7:00 a.m., and had commenced a "criminal death investigation" by 7:02 a.m.  By this time if not before, the police had asserted "dominion and control" over Defendant's home (and effectively everything within it) as part of their investigation into Candice's death.  *See Jacobsen*, 466 U.S. at 120 & n.18.

The Government says the police "understandably" secured Defendant's home from the outside.  The police never entered the interior of Defendant's home, let alone searched it, prior to Defendant's subsequent consent to search.  But how these observations bear on the question of whether a Fourth Amendment seizure—defined as a meaningful interference with an individual's possessory

13

interests in property—occurred when police secured Defendant's home immediately following Candice's death escapes us. We see little difference between a perimeter stakeout and internal securing of a home from the standpoint of a Fourth Amendment *seizure*. Both interfere to the same extent with the possessory interests of those entitled to occupy the dwelling. *See Segura*, 468 U.S. at 811 (plurality). The Government cannot reasonably dispute that the "securing" of Defendant's home during the early morning hours of March 11, 2015 infringed not only on his possessory interest in the home but also on his liberty interest in free movement. *See United States v. Place*, 462 U.S. 696, 708 (1983). The police deprived Defendant of his ability to access his home for his own purposes, in his own way, on his own time, and at a location where concerned friends and well-wishers would surely come calling. *Cf. California v. Hodari D.*, 499 U.S. 621, 624 (1991) ("From the time of the founding to the present, the word 'seizure' has meant a "taking possession[.]").

The Supreme Court reminded us just this past term that "when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's very core stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Collins v. Virginia*, 138 S. Ct. 1663, 1670 (2018) (citations and quotation marks omitted); *see also Wong Sun*, 371 U.S. at 484 (recognizing the "fundamental constitutional guarantee[] of sanctity of the home"). The right to retreat into one's abode following the unexpected death of a loved one would ring hollow if law enforcement could simply "secure" the home under the

14

auspices of a "criminal" investigation and exclude one therefrom without constitutional implication upon the, in the words of Investigator Cooke, "not normal" death of a household member. "'[A] man's house is his castle,' whether it is under siege by police officers prying into his possessions stored within or whether they exclude him from its sanctuary." *United States v. Song Ja Cha*, 597 F.3d 995, 1002 (9th Cir. 2010) (citation omitted) (quoting *Payton v. New York*, 445 U.S. 573, 598 (1980)).

B.

Of course, not every seizure at the hands of government officials violates the Fourth Amendment. Only unreasonable seizures are proscribed. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). At its inception, a seizure must be reasonable to comport with the Fourth Amendment. *Roberson*, 864 F.3d at 1121. The seizure must then remain reasonable "throughout its duration and in the entirety of its scope." *United States v. Martinez*, 518 F.3d 763, 766 (10th Cir. 2008). The reasonableness of police conduct turns on the facts and circumstances of each case viewed in the light of established Fourth Amendment principles. *Ohio v. Robinette*, 519 U.S. 33, 39 (1996); *see also United States v. Rabinowitz*, 339 U.S. 56, 83 (1950) (Frankfurter, J., dissenting). In particular, to determine whether the seizure of Defendant's home in this case was reasonable we need look no further than the Fourth Amendment principles established in *Illinois v. McArthur*, 531 U.S. 326 (2001).

In *McArthur*, the complaining witness told a police officer that the defendant,

15

her ex-boyfriend, had "dope" in his trailer.  When the defendant refused the officer's request to search, the officer told the defendant, who was outside the trailer, that he could not reenter the trailer unless accompanied by an officer.  Another officer returned with a search warrant less than two hours later.  The search uncovered a small amount of marijuana under the sofa.  The defendant moved to suppress this evidence, reasoning the evidence was the "fruit" of the unlawful seizure of his trailer.  The Court held, however, that a police officer could lawfully prevent the defendant from entering his trailer while another officer diligently obtained a search warrant.  *Id.* at 328.  The Court explained that excluding the defendant from his trailer was reasonable in light of the following circumstances: (1) the police had probable cause to believe the defendant's trailer contained evidence of a crime, namely his possession of illegal drugs; (2) the police had good reason to fear the defendant might destroy the evidence before they procured a warrant; (3) the police, by only preventing the defendant from entering his trailer unaccompanied, made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy; and (4) the police excluded the defendant from his trailer for a limited time, namely two hours.  *Id.* at 331–33.

*McArthur* plainly teaches us a police officer armed with probable cause to believe a home contains evidence of a serious crime that might otherwise be destroyed may lawfully secure the home and restrict entry while waiting for an assisting officer to diligently procure a search warrant.  *See id.* at 333–34; *see also*

16

*Segura*, 468 U.S. at 798.  But here, unlike in *McArthur*, the Government has never suggested that probable cause (or any form of articulable suspicion for that matter) justified the initial seizure of Defendant's home.  And we have news for the Government.  No such thing as a "crime scene exception," let alone an "unexplained death scene exception," to the Fourth Amendment exists.  *See Flippo v. West Virginia*, 528 U.S. 11, 13–14 (1999) (declining to recognize a crime scene exception to the Fourth Amendment).  In the context of a home seizure, "the mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment['s]" probable cause requirement.  *Mincey v. Arizona*, 437 U.S. 385, 393 (1978) (holding a warrantless search of the defendant's apartment was not permissible simply because a murder recently occurred there).

Neither, unlike in *McArthur*, has the Government ever suggested that some sort of exigency justified the seizure of Defendant's home.  Absent valid consent, the warrantless seizure of a home even in the presence of probable cause "is *per se* unreasonable, unless the police can show that it falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.'"  *Coolidge v. New Hampshire*, 403 U.S. 443, 474–75 (1971); *see also Brigham City*, 547 U.S. at 403.  At the suppression hearing, Investigator Cooke stated that when Defendant's home was "secured" on the morning of Candice's death, he "didn't have anything" other than a death that was "not normal."  Moreover, Cooke previously explained that the initial report he received was "it was not a suspicious death."  In

17

other words, the police, according to the record before us, had no knowledge of any facts suggesting Defendant or his now-deceased wife were engaged in criminal wrongdoing inside their home. And at least in the context of Fourth Amendment jurisprudence, the police certainly *never* have good reason to fear the destruction of incriminating evidence of which they have no particularized knowledge.

Nor did the police in this case, again unlike in *McArthur*, make any effort to reconcile their law enforcement needs with Defendant's Fourth Amendment interests in his home as a place of refuge, privacy, and comfort. *See Place*, 462 U.S. at 703. This seizure was not minimally intrusive; rather it was the commencement of a fishing expedition to see what sort and how big of fish the police might catch. The police completely disregarded Defendant's constitutional rights and seized his home so they could find out, again in the words of Investigator Cooke, "what's going on." Inexplicably, Cooke would not even allow Defendant supervised entry into his own home to urinate. For reasons unclear to us apart from Investigator Cooke's preference and convenience, the seizure extended over a period of eighteen hours even though probable cause arose sometime around 11:00 a.m. or about four hours into the investigation. By then, Cooke had seen the ammunition inside the bedroom closet and learned of Defendant's felony status and had all the probable cause he needed to procure a search warrant. ATF agents at the behest of Cooke, however, did not procure a warrant until eleven hours later or 10:00 p.m.

In addition to Candice's unexplained death, which in itself was no basis for

18

seizing Defendant's home, the district court provided two ex post facto rationales to justify the initial seizure. The first rationale was "the subsequent establishment of probable cause after Investigator Cooke observed the ammunition and learned of defendant's felon status." In answer to this we can only say a Fourth Amendment seizure unlawful at its inception "does not change character from its success." *United States v. Di Re*, 332 U.S. 581, 595 (1948). The initial legality of a seizure turns on the facts and circumstances known to the police at the time of the seizure rather than on facts and circumstances subsequently discovered. *United States v. Cantu*, 405 F.3d 1173, 1178 (10th Cir. 2005); *see also Wong Sun*, 371 U.S. at 484 (recognizing the Supreme Court has "consistently rejected" the proposition "that a search unlawful at its inception may be validated by what it turns up").

The court's second rationale to justify the seizure was "the time it took to coordinate between state and federal law enforcement to secure a search warrant." As for this rationale, we simply observe that the time taken to procure a warrant to search a previously seized home has no bearing on the legality of the home's *initial* seizure. Rather, the time taken to procure a warrant bears upon the continuing reasonableness of a seizure reasonable at its inception. *See Segura*, 468 U.S. at 812 (plurality) (recognizing a seizure reasonable at its inception may become unreasonable as a result of its duration); *see also United States v. Villa-Chaparro*, 115 F.3d 797, 801–03 (10th Cir. 1997) (separately addressing the questions of whether a seizure was reasonable at its inception and whether that seizure became

19

unreasonable based on its duration). The time taken to procure a warrant, no matter how brief, does not turn a seizure unreasonable at its inception into a reasonable seizure. An unreasonable warrantless seizure of one's home, that is, a seizure unsupported by probable cause and exigent circumstances at the outset, does not become reasonable based on after-the-fact rationales.

IV.

Having held without any difficulty that law enforcement's initial securing of Defendant's home on the morning of Candice's death constituted an unreasonable seizure in violation of the Fourth Amendment, we are now prepared to consider the effect of this illegal seizure on what followed.[8] A defendant has the initial burden of establishing a causal connection between an illegal seizure and the evidence he seeks to suppress. *United States v. Torres-Castro*, 470 F.3d 992, 999 (10th Cir. 2006). Specifically, the defendant must establish the incriminating evidence "would not have come to light *but for* the illegal [seizure]." *Wong Sun*, 371 U.S. at 488 (emphasis added). "But for" causation, however, is only a necessary condition for suppression; it is not sufficient. *Torres-Castro*, 470 F.3d at 999. Once a defendant establishes "but for" causation, the Government may still avoid suppression. *Id.* At this point, the relevant inquiry becomes whether the Government has proven the

---

[8] Quite frankly, this would have been a much more straightforward case both in the district court and here if the Government had conceded the obvious, that is, the unconstitutionality of the initial seizure of Defendant's home.

incriminating evidence was discovered by means sufficiently distinguishable from the initial illegality to be purged of the primary taint. *Wong Sun*, 371 U.S. at 488.

This latter inquiry is tied to the aims and costs of the exclusionary rule. "The fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). The exclusionary rule is not a constitutional right but a prudential doctrine that the Supreme Court has created to compel respect for Fourth Amendment guarantees. *Davis v. United States*, 564 U.S. 229, 236 (2011). "The rule's sole purpose . . . is to deter future Fourth Amendment violations." *Id.* at 236–37. Before exclusion is appropriate, the deterrence benefits of suppression must outweigh the rule's "costly toll upon truth-seeking and the law enforcement objectives" of apprehending criminals and protecting the public. *Herring*, 555 U.S. at 141.

Where an unlawful seizure of a home precedes a "consensual" search of the home and the discovery of incriminating evidence then used to procure a search warrant, the Government's burden to prove the primary taint of the illegality has been purged, *i.e.*, that the search warrant and its "fruits" are valid, is two-fold. *See Murray v. United States*, 487 U.S. 533, 540 (1988) (recognizing that evidence discovered as a result of an unlawful entry "cannot be used to establish probable cause before a magistrate"). The Government must prove the voluntariness of a defendant's consent consistent with the principles set forth in *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). But in addition, the Government must

21

demonstrate a break in the causal chain somewhere between the illegality and discovery of the incriminating evidence used to support the defendant's prosecution. *United States v. Fox*, 600 F.3d 1253, 1257 (10th Cir. 2010). Professor LaFave explains that while the Government's dual burdens may overlap, "it is extremely important to understand that (i) the two tests are not identical, and (ii) consequently the evidence obtained by the purported consent should be held admissible only if it is determined that the consent was *both* voluntary and not an exploitation of prior illegality." Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 8.2(d) at 101 (5th ed. 2012) (emphasis in original). This means "the fruit of the poisonous tree doctrine [may] also extend[] to invalidate consents which *are* voluntary" in the traditional sense.[9] *Id.* § 8.2(d) at 102 (emphasis in original); *see Florida v. Royer*, 460 U.S. 491, 495, 501, 507–08, 509 (1983) (plurality plus Brennan, J., concurring) (holding an illegal seizure of the defendant tainted his subsequent consent to search without questioning the trial court's ruling that his consent was "freely and voluntarily given"). We require the Government to demonstrate a break in the causal chain for two reasons. *United States v. Melendez-Garcia*, 28 F.3d 1046, 1054 (10th Cir. 1994). First, we are concerned the illegal seizure may have affected the voluntariness of the defendant's consent that led to

---

[9] In *Schneckloth*, the Supreme Court addressed the question of "what must the prosecution prove to demonstrate that a consent was 'voluntarily' given." *Schneckloth*, 412 U.S. at 223. Notably no police misconduct preceded the consent to search in that case.

discovery of the incriminating evidence. *Id.* (recognizing the Government has a "heavier burden" to carry when consent follows an illegal seizure). Second, we are bound, where appropriate, to effectuate the exclusionary rule's deterrence principle. *Id.*

A.

Because here the historical facts are undisputed and the record of the district court proceedings, which includes Investigator Cooke's taped interview with Defendant, was adequately developed, we exercise our discretion to proceed.[10] Accordingly, let us commence the proper analysis by considering whether Defendant has established "but for" causation. Justifiably apart from any unwarranted speculation about what might have transpired if the police had not unlawfully seized Defendant's home, Defendant can easily meet his burden to show that but for the illegal seizure, law enforcement would not have discovered the incriminating evidence he seeks to suppress. If Defendant is allowed to access his home and

---

[10] We have explained that because the district court held the initial seizure of Defendant's home complied with the Fourth Amendment and his subsequent consent to search was knowing and voluntary, the court did not ask whether the challenged evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488 (quotation marks omitted). Nonetheless, because proceedings in the district court "resulted in a record of amply sufficient detail and depth from which th[is] determination may be made," we decline to remand this case so that the district court may undertake the proper analysis in the first instance. *Brown v. Illinois*, 422 U.S. 590, 604 (1975); *accord United States v. Fernandez*, 18 F.3d 874, 881 n.7 (10th Cir. 1994).

retrieve the medication himself, Investigator Cooke's entrance into the home to retrieve the medication pursuant to Defendant's consent to search is unnecessary. Absent entry into the home, Investigator Cooke *never* sees the ammunition he *necessarily* relied on to prompt the ATF to procure the search warrant, the execution of which led directly to the incriminating evidence used to prosecute Defendant.

Next, we must determine whether the Government may avoid suppression of the evidence notwithstanding the illegal seizure of Defendant's home. Inevitably, our analysis at this stage becomes much more complex. Setting aside the question of whether Defendant's consent was voluntary in the traditional sense under the principles established in *Schneckloth*, we turn our attention to that part of the Government's burden requiring it to break the causal chain. Three exceptions to the exclusionary rule address the "causal relationship between the unconstitutional act and the discovery of evidence." *Utah v. Strieff*, 136 S. Ct. 2056, 2061 (2016). Two of these exceptions, however, do not address whether the taint has been purged despite "but for" causation, but rather bear upon "but for" causation itself. The independent source doctrine permits courts to admit evidence notwithstanding a prior illegality if law enforcement acquired the incriminating evidence from a separate, independent source. *Id.* The inevitable discovery doctrine countenances the admission of evidence that would have been discovered regardless of prior police illegality. *Id.*; *see Murray v. United States*, 487 U.S. 533, 539 (1988) (recognizing the latter doctrine "is in reality an extrapolation" of the former doctrine because if

24

"the tainted evidence would be admissible if in fact discovered through an independent source, it should be admissible if it inevitably would have been discovered" through such a source).

In this case, nothing in the record remotely suggests law enforcement obtained the incriminating evidence against Defendant from an independent source, *i.e.*, a source wholly separate from the illegal seizure of Defendant's home and what followed therefrom. *See Segura*, 468 U.S. at 815 (applying the independent source doctrine because the unlawful entry into the home "did not contribute in any way to discovery of the evidence seized under the warrant"). Additionally, any suggestion that the police inevitably would have discovered the incriminating evidence against Defendant had they not initially seized his home and prohibited him access is far too speculative. "[I]nevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification . . . ." *Nix v. Williams*, 467 U.S. 431, 444 n.5 (1984). What would have transpired had the police not illegally seized Defendant's home from the outset and denied him access is anybody's guess. This leaves us to examine the third exception to the exclusionary rule bearing upon causation—the attenuation doctrine.

The notion of attenuation or "'dissipation of the taint' [of the prior illegality] attempts to mark the point at which the detrimental consequences of illegal police action become so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost." *Brown v. Illinois*, 422 U.S. 590, 609 (1975) (Powell, J.,

25

concurring in part).  This exception may apply even in the presence of "but for" causation.  Attenuation occurs "when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance so that the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained." *Strieff*, 136 S. Ct. at 2061.

The factors the Supreme Court articulated in *Brown* and reiterated in *Strieff* guide our determination of whether the illegal seizure of Defendant's home tainted the incriminating evidence or whether such taint has been purged. *Brown*, 422 U.S. at 603–04; *Strieff*, 136 S. Ct. at 2061–62.  First, we consider the temporal proximity between the illegal seizure and discovery of the incriminating evidence used to prosecute Defendant to determine whether time has rendered the connection between the illegality and the evidence remote and suppression inappropriate.  *Strieff*, 136 S. Ct. at 2062.  Second, we look for the presence of any intervening circumstances during this time period to determine, just as we must under our first inquiry, whether suppression would serve the interest protected by the Fourth Amendment's proscription against unreasonable seizures.  *Id.*  Third, "and 'particularly' significant," we examine the purposes and flagrancy of the official misconduct.  *Id.* (quoting *Brown*, 422 U.S. at 604).  This factor favors exclusion "only when the police misconduct is most in need of deterrence—that is, when it is purposeful or flagrant." *Id.* at 2063.  Where the district court fails to employ the *Brown* factors

and ask whether the taint of a prior illegality has been purged, but the record is adequately developed, we may undertake our own de novo review of these factors. *Melendez-Garcia*, 28 F.3d at 1054; *see also supra* n.10.

B.

Recall the time line in this case. Local law enforcement seized Defendant's home around 7:00 a.m. Defendant spent the next two and a half hours at the police station speaking with Investigator Cooke and others. About 9:30 a.m., Defendant signed a limited consent to search form outside his home authorizing Investigator Cooke to enter the home and retrieve Candice's medication. Cooke completed his search of Defendant's home around 10:00 a.m. By 11:30 a.m. Cooke possessed sufficient knowledge to procure a search warrant. He knew Defendant was a convicted felon and had ammunition in his bedroom closet. Cooke did not seek a search warrant, however, until the early evening hours.[11] The only event of sufficient note during the period between the establishment of probable cause that morning and the process of procuring a search warrant that evening was Candice's autopsy which began at 1:30 p.m. and concluded around 3:30 p.m. A federal

---

[11] Here we cannot help but note the affidavit in support of the search warrant represented that "Mr. Shrum and possibly others still have access to the residence and could remove the ammunition and other evidence if it is not located and removed immediately. If the search warrant is not executed at night there is the possibility that evidence of a crime could be removed or destroyed." This representation, of course, was simply not true but rather verifiably false and is indicative of the shoddy course of the investigation into Candice's death.

27

magistrate judge issued the warrant at 10:00 p.m.  Three federal agents together with

Investigator Cooke and another officer executed the warrant beginning at 11:18 p.m.

or twelve hours after probable cause arose.  Their search concluded at 1:20 a.m.

In *Strieff*, the Supreme Court observed that its "precedents have declined to

find that [the temporal proximity] factor favors attenuation unless 'substantial time'

elapses between an unlawful act and when the evidence is obtained."  *Strieff*, 136 S.

Ct. at 2062 (quoting *Kaupp v. Texas*, 538 U.S. 626, 633 (2003) (per curiam)).  The

longer the time lapse between the initial illegality and the acquisition of the

challenged evidence, especially where the evidence is verbal, the more likely such

evidence has been purged of the illegality's primary taint, *i.e.*, has become

attenuated.[12]  *Wong Sun* is the best example.  There the Supreme Court held that

where the defendant had been arraigned and released on his own recognizance and

then voluntarily returned *several days later* to make an incriminating statement, the

---

[12]  In *United States v. Ceccolini*, 435 U.S. 268, 276–77 (1978), the Supreme
Court cogently reasoned that attenuation analysis must account for the difference
between verbal and physical evidence:

> Witnesses are not like guns or documents which remain hidden from
> view until one turns over a sofa or opens a filing cabinet.  Witnesses
> can, and often do, come forward and offer evidence entirely of their
> own volition.  And evaluated properly, the degree of free will necessary
> to dissipate the taint will very likely be found more often in the case of
> live-witness testimony than other kinds of evidence.

In so reasoning, the Court modified its observation in *Wong Sun* that "the policies
underlying the exclusionary rule [do not] invite any logical distinction between
physical and verbal evidence."  *Id.* at 275 (brackets in original) (quoting *Wong Sun*,
371 U.S. at 486).

connection between his unlawful arrest and his statement had "become so attenuated as to dissipate the taint." *Wong Sun*, 371 U.S. at 491 (quoting *Nardone v. United States*, 308 U.S. 338, 341 (1939)). In other words, the defendant's statement on this later date was "sufficiently an act of free will to purge the primary taint of the unlawful [arrest]." *Id.* at 486.

Unlike *Wong Sun*, however, the facts in this case reveal Defendant had little time to exercise "free will" between the unlawful seizure of his home and his execution of the consent to search form two and a half hours later. *See Brown*, 422 U.S. at 604–05 (concluding a two hour separation between an illegal arrest and confession without any intervening event did nothing to dissipate the taint). And once Investigator Cooke had completed the search of Defendant's home thirty minutes after that, the length of time taken to procure the search warrant and execute it rested entirely outside Defendant's control. While most Fourth Amendment cases such as those addressing traffic stops or arrests involve relatively brief time spans, Defendant's home remained under the dominion and control of the police throughout the duration of the day long episode. Thus, the time that elapsed between the initial unlawful seizure and discovery of the incriminating evidence used to prosecute Defendant *in itself* no way rendered the connection between the two remote. While the temporal proximity between an illegal seizure and discovery of the evidence a defendant seeks to suppress is never immaterial, we conclude here that this factor does nothing to advance the Government's burden to prove attenuation. *See United*

29

*States v. Ceccolini*, 435 U.S. 268, 275 (1978) ("[T]he Court of Appeals was simply wrong in concluding that if the road were uninterrupted, its length was immaterial.").

Turning to a consideration of intervening events, what transpired in the two and a half hours between the seizure of Defendant's home and his consent to search is critical to our analysis. Specifically, we refer here to Investigator Cooke's interview with Defendant. The record first reflects Defendant's knowledge of his home's seizure a few minutes after 7:00 a.m. when he called his friend Teresa from the law enforcement center and told her: "I ain't home yet because they ain't lettin' me go home yet." Some two hours later, after Defendant had expressed the desire for an autopsy because he wanted to know why Candice died and Investigator Cooke had told him the coroner needed Candice's medication, Cooke informed Defendant that the police would "hold onto your house as a scene" until the autopsy was concluded. Defendant responded "[t]hat's fine" and "[a]nything I can do to help." The district court found Defendant "seemingly consented" (whatever that means) to his home's seizure when he agreed with Cooke during the interview that the police should "hold onto" his home. The Government suggests this "agreement" effectively purged the subsequent taint of any illegal seizure; in other words, this was the first intervening event that broke the "causal chain" between the illegal seizure and the evidence Defendant seeks to suppress.

But under the circumstances presented, Defendant's responses hardly establish his after-the-fact consent to his home's unlawful seizure. Investigator Cooke offered

30

Defendant no choice; rather Cooke was telling Defendant how it was. The record in this case gives us no reason to believe Defendant's responses were anything other than "a mere submission to a claim of lawful authority." *Kaupp*, 538 U.S. at 631 (quoting *Royer*, 460 U.S. at 497). Defendant's statement to Teresa that "they ain't lettin' me go home yet," indicates to us that Defendant understood he did not have much say in the matter or much of a choice. Of course, the concept of choice, *i.e.* the right to say yes or no, is inherent in the definition of consent. *Cf. United States v. Jones*, 701 F.3d 1300, 1314 (10th Cir. 2012). The Government cannot meet its burden "by showing no more than acquiescence to a claim of lawful authority." *Bumper v. North Carolina*, 391 U.S. 543, 548–49 (1968).

The Government further tells us Defendant's execution of the consent to search form authorizing Investigator Cooke to enter his home was the second intervening event that broke the causal chain. Again the details of what transpired immediately preceding Defendant's consent are critical. After Investigator Cooke informed Defendant he was "going to do what's called a consent to search and I'm just going in to retrieve the medication," Defendant referenced the need for an attorney (a reference clearly audible on the audio tape) and hesitated before breaking down: "I wanna know what happened to her. I ain't got nothin' to hide from you people. She's my baby, she's my everything. I know you have to." Shortly thereafter Cooke sought to prompt Defendant to action while reassuring him: "Let's run over to the house. Let's get your dogs. Let's get the medication." Let's

31

find out "what's going on." A few minutes later Cooke repeated himself: "Let's go get your dogs. Let's get this medication," all the while reminding Defendant: "I can't let you go in the house. I'll just tell you I can't let you go in the house, but if you'll tell me where the stuff is."

Well established precedent teaches us that the question here is not only whether Defendant's consent was voluntary but also whether his consent was "an act of free will [sufficient] to purge the primary taint of the unlawful invasion." *Kaupp*, 538 U.S. at 632 (brackets in original) (quoting *Wong Sun*, 371 U.S. at 486). Under the second *Brown* factor, the Government must establish "facts or events which ensure that the consent provided was not the fruit of the illegal seizure. The facts or events must create a discontinuity between the illegal seizure and the consent such that the original illegality is weakened or attenuated." *Fox*, 600 F.3d at 1260 (brackets, ellipses, and quotation marks omitted); *see Royer*, 460 U.S. at 501 (plurality) ("*Brown* hold[s] that statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.").

Here the facts suggest Defendant's consent to search was the direct result of the illegal seizure of his home rather than an act of free will sufficient to purge its taint. By all appearances, Investigator Cooke consciously designed the circumstances under which Defendant provided his consent to convince him that he had no choice but to accede to the investigator's wishes. When a police officer

32

claims authority to seize your home because your wife died unexpectedly, and tells you the coroner needs medication from the home to perform an autopsy but you cannot go inside the home to retrieve the medication, what choice do you have? Must you allow law enforcement to seize your home indefinitely? Defendant's lack of choice once again is well illustrated by his statement to Investigator Cooke, "I know you have to," and Cooke's subsequent reminder, "I'll just tell you I can't let you go in the house, but if you'll tell me where the stuff is." Nothing between the time of law enforcement's illegal seizure of Defendant's home and Investigator Cooke's search of the home broke the causal chain. Because Defendant's consent was tainted, Cooke's search pursuant to that consent also was tainted. And any evidence obtained as a result of an unlawful search cannot be used to establish probable cause for issuance of a search warrant. *See Murray*, 487 U.S. at 540.

This leaves us to consider the purpose and flagrancy of the illegal seizure of Defendant's home. Because the exclusionary rule "serves to deter deliberate, reckless, or grossly negligent conduct" in addition to "recurring or systemic negligence," only by considering law enforcement's culpability may we determine the efficacy of excluding the incriminating evidence against Defendant in deterring future Fourth Amendment violations and in particular unreasonable seizures of the home. *Herring*, 555 U.S. at 144. The Supreme Court has told us a court should suppress evidence only if a police officer "may properly be charged with knowledge, that the [seizure] was unconstitutional." *Id.* at 143 (quotation marks omitted). "The

33

pertinent analysis of deterrence and culpability is objective, not an inquiry into the subjective awareness" of the officer. *Id.* at 145 (quotation marks omitted). We ask whether a "reasonably well trained officer would have known" the seizure of Defendant's home was unlawful under the totality of the circumstances. *Id.* (quotation marks omitted).

For reasons we explained in Part III of our opinion, we have no difficulty concluding that a reasonably well trained officer would have understood the seizure of Defendant's home under the circumstances presented was contrary to the Fourth Amendment. At the suppression hearing, the *only* explanation Investigator Cooke gave to justify the warrantless seizure of Defendant's home following Candice's demise was that it was not a "normal death. . . . [S]o securing anything that may have given us information into that was the reason for the scene being held." But as the astute reader well knows by now, Investigator Cooke's justification falls woefully short of what the Fourth Amendment requires to justify a warrantless seizure of a home. Absent consent, the Fourth Amendment requires probable cause and exigent circumstances. *See McArthur*, 531 U.S. at 333–334. Neither is it any use to say the ATF agents who were primarily responsible for obtaining and executing the search warrant were blameless and acted in good faith. Otherwise a police officer could illegally seize a home, obtain a tainted consent to search, and then, equipped with incriminating evidence, rely on colleagues ignorant of the circumstances used to justify the search warrant to obtain the same. Such an approach would do little to

34

deter unlawful seizures. *See Herring*, 555 U.S. at 140, 146.

* * *

To recap: Law enforcement unreasonably seized Defendant's home in violation of the Fourth Amendment. Immediately thereafter, Investigator Cooke interviewed Defendant for over two hours at the police station. Defendant subsequently signed a consent to search form permitting Cooke to search his home. But given the undisputed record facts, Defendant's consent was not an act of free will sufficient to purge the primary taint of the illegal seizure. Rather, his consent was "come at by exploitation" of such seizure. *Wong Sun*, 371 U.S. at 488. Consequently, Cooke unlawfully searched Defendant's home and witnessed ammunition in the home's bedroom closet. Probable cause, tainted from the unlawful search, arose when Cooke connected Defendant's status as a convicted felon with the ammunition. Cooke requested federal agents to procure a search warrant and a neutral magistrate judge unknowingly issued a tainted warrant. Law enforcement executed the tainted warrant and discovered the incriminating evidence Defendant now seeks to suppress. Necessarily, this evidence too was tainted. While the causal chain is relatively long, nowhere along the links of the chain were the "fruits" of the unlawful seizure of Defendant's home purged of their primary taint. Accordingly, the district court's denial of Defendant's motion to suppress is REVERSED. This cause is REMANDED for further proceedings consistent with this opinion.

*United States v. Shrum*, No. 17-3059

**EID**, J., concurring in part and dissenting in part.


I agree with the majority that the seizure of Defendant's home was unreasonable. The Fourth Amendment allows for "a temporary seizure [that is] supported by probable cause and . . . designed to prevent the loss of evidence while the police diligently obtai[n] a warrant in a reasonable period of time." *Illinois v. McArthur*, 531 U.S. 326, 334 (2001). Here, as we conclude today, the seizure was none of those things. I disagree, however, with the majority's decision to go on to determine whether the attenuation and independent source exceptions to the exclusionary rule apply (ultimately deciding that they do not), rather than remanding the case for such a determination. I come to this conclusion for three reasons.

First, although the district court made some passing references to Defendant's consent to the search, it did not consider whether his consent constituted a break in the causal chain under the attenuation doctrine because it did not need to under its understanding of the case – namely, that the initial seizure of the home was reasonable (an understanding we find erroneous today). Nor did the district court find it necessary to consider the independent source doctrine. It is the general practice of this court to remand for determination of such issues, *see, e.g.*, *United States v. Carter*, 360 F.3d 1235, 1243 (10th Cir. 2004) (concluding that "the district court is better able to address" whether defendant's consent was the product of the preceding illegal search and remanding for such a determination), and indeed the Supreme Court did so, after it

declined to recognize a "crime scene exception" to the warrant requirement. *Flippo v. West Virginia*, 528 U.S. 11, 15 (1999) (per curiam) (remanding for consideration, inter alia, of whether defendant impliedly consented to the search); Maj. Op. at 17 (citing *Flippo*). I see no reason to depart from this general practice in this case. Thus, while I do not question the court's authority to decide the issues here, I would not exercise our discretion to do so in this case.

Second, the issues of attenuation and independent source received virtually no attention in the briefing before this court. And significantly, to the extent they did receive attention, Defendant urged this court to remand for their determination. *See, e.g.*, Aplt. Br. at 35 (arguing that "[t]he district court should decide, in the first instance, whether Mr. Shrum's consent purged the taint of the unconstitutional seizure"); *id.* at 42 ("This court should also remand for an additional determination on the independent-source doctrine").[1] The lack of adequate briefing on these issues further convinces me that they are best left to a remand.

Finally, the majority interprets and applies *Utah v. Strieff*, ___ U.S. ___, 136 S. Ct. 2056, 2061 (2016), the Court's most recent pronouncement on the doctrines of attenuation, independent source, and inevitable discovery – three exceptions to the

[1] Defendant also argues that the district court erroneously concluded that he had abandoned his involuntary-consent argument, and asks this court to remand for the district court to adequately address the voluntariness of consent issue. Aplt. Br. at 37. The majority does not address the abandonment issue, and instead finds that Defendant's consent was involuntary without the benefit of adequate consideration of this issue by the district court. Maj. Op. at 31. I agree with Defendant that the district court erred in finding voluntariness abandoned, and would remand that issue as well.

2

exclusionary rule that "involve the causal relationship between the unconstitutional act and the discovery of evidence." The majority opinion in this case marks the first time in a published opinion this court has interpreted and applied *Strieff*. In my view, the better course of action would be to explore the parameters of *Strieff* in a case in which there is a district court decision on the matter as well as adequate briefing before this court.

For these reasons, I would remand this case to the district court to consider the issues of attenuation and independent source in the first instance. Accordingly, I dissent from that portion of the majority opinion declining to remand the case.